UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiff,

v.

U.S. FISH AND WILDLIFE SERVICE, et al.,

Defendants.

No. 2:24-cv-03756-DAD-CKD

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

(Doc. Nos. 27, 29)

This matter is before the court on a motion for summary judgment brought by plaintiff Center for Biological Diversity (Doc. No. 27) and a cross-motion for summary judgment brought by defendants U.S. Fish and Wildlife Service ("FWS"), Director of FWS Martha Williams, and Secretary of the Interior Deb Haaland (collectively, "defendants") (Doc. No. 29). On February 18, 2026, the motions were taken under submission on the papers. (Doc. No. 38.) For the reasons explained below, the court will grant plaintiff's motion and deny defendants' cross-motion.

/////

/////

/////

/////

## BACKGROUND

### A. The Endangered Species Act ("ESA") and Critical Habitat Designation

"The Endangered Species Act is a comprehensive scheme with the 'broad purpose' of protecting endangered and threatened species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1106 (9th Cir. 2012) (citations omitted).

In designating a species endangered or threatened pursuant to the ESA, the FWS is further required to, "by regulation . . . and to the maximum extent prudent and determinable[,] . . . concurrently with making a determination . . . that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat[.]" 16 U.S.C. § 1533(a)(3)(A)(i). "The term 'critical habitat' for a threatened or endangered species means— (i) the specific areas within the geographic area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species . . . upon a determination by [FWS][1] that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A). "The terms 'conserve', 'conserving', and 'conservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). "'[C]onservation' encompasses both ensuring species' survival and recovery[.]" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1038 (9th Cir. 2023). Pursuant to regulation, FWS may decline to issue a critical habitat designation as "not prudent" in several circumstances, including where "[t]he present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species[.]" 50 C.F.R. § 424.12(a)(1)(ii).

/////

---

[1] "The duties of the Secretary are delegated to FWS under 50 C.F.R. § 402.01(b)." *Ctr. for Biological Diversity v. Haaland*, No. 23-cv-00391-TUC-RCC, 2026 WL 847695, at *2 (D. Ariz. Mar. 27, 2026).

**B. The Administrative Record**[2]

On April 27, 2011, plaintiff filed a petition with FWS to list the Sierra Nevada red fox, which has two small California populations near Lassen Peak and Sonora Pass, as a threatened or endangered species, and to designate critical habitat concurrent with the listing. (Doc. No. 36-1 at 65–66.) In February 2018, FWS published a Special Status Assessment Report on the Sierra Nevada distinct population segment of the Sierra Nevada red fox (the population near Sonora Pass) ("SNRF"). (Doc. No. 35-1 at 87.) On January 8, 2020, FWS promulgated a proposed rule designating the SNRF as an endangered species under the ESA but declined to designate any part of the SNRF's habitat as critical habitat, claiming that to do so would be "not prudent." (*Id.* at 140.) On August 3, 2021, following notice and comment, FWS promulgated a final rule, which finalized both the designation of the SNRF as an endangered species and the decision not to designate critical habitat for the species. (*Id.* at 152.)

The FWS's proposed rule states as follows:

> [T]he present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the Sierra Nevada red fox.
>
> . . .
>
> Overall, we conclude that there are not any current or future significant habitat-based threats, and the best available information suggests that threats to the subspecies directly . . . are of greatest concern.
>
> . . .
>
> [Predicted] changes are not currently expected, nor in the future projected, to result in significant negative influences on the viability of the DPS.[3]
>
> . . .
>
> Because we assessed that the present or threatened destruction, modification, or curtailment of the Sierra Nevada red fox's habitat is

[2] The relevant facts that follow are from the administrative record prepared and filed with the court by defendants. (Doc. Nos. 35, 36, 37.)

[3] "DPS" stands for "Distinct Population Segment."

> not a significant threat to the species, we have determined that designating critical habitat is not prudent at this time.

(*Id.* at 150.)

The final rule states as follows:

> Our evaluation of the best available scientific and commercial information indicates the Sierra Nevada DPS's resiliency is not significantly adversely affected by impacts specifically associated with its habitat.
>
> . . .
>
> As such, we conclude that there are not any current or future significant habitat-based threats. The best available scientific and commercial information suggests that threats to the subspecies directly (as opposed to habitat) are of greatest concern.
>
> . . .
>
> [W]e determined that designation of critical habitat was not prudent because the present or threatened destruction, modification, or curtailment of habitat or range is not a threat to the Sierra Nevada DPS[.]

(*Id.* at 157, 160.)

**C. Procedural History**

On December 30, 2024, plaintiff filed this action asserting the following two claims for relief: (1) FWS's application of the "not prudent" exception violates the ESA and Administrative Procedure Act ("APA"); and (2) FWS's "not prudent" finding is arbitrary and capricious and counter to the best scientific information available in violation of the ESA and APA. (Doc. No. 1 at ¶¶ 78–94.)

On August 8, 2025, plaintiff filed its motion for summary judgment in its favor. (Doc. No. 27.) On September 26, 2025, defendants filed their cross-motion for summary judgment in their favor. (Doc. No. 29.) On October 27, 2025, plaintiff filed a reply in support of its motion for summary judgment. (Doc. No. 30.) On December 4, 2025, defendants filed their reply in support of their motion for summary judgment. (Doc. No. 34.) On December 16, 2025, defendants filed the administrative record with the court. (Doc. Nos. 35, 36, 37.)

/////

## APPLICABLE LEGAL STANDARDS

### A. The ESA and APA

The ESA contains a citizen suit provision according to which "any person may commence a civil suit on his own behalf . . . against [FWS] where there is alleged a failure of [FWS] to perform any act or duty under section 1533 of this title which is not discretionary with [FWS]." 16 U.S.C. § 1540(g)(1)(C). "An agency's compliance with the ESA is reviewed under the [APA]." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc); *see also Alaska v. Nat'l Marine Fisheries Serv.*, 2025 WL 4664007, at *7 n. 3 (9th Cir Mar. 25, 2026).[4] "Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Karuk Tribe of Cal.*, 681 F.3d at 1017 (quoting 5 U.S.C. § 706(2)(A)); *see also N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 824 (9th Cir. 2025); *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 986 (9th Cir. 2015) (noting that, under the APA, the FWS's designation of critical habitat "will be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)).

### B. Summary Judgment

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Karuk Tribe of Cal.*, 681 F.3d at 1017. "Summary judgment is a particularly appropriate tool for resolving claims challenging agency action." *Ctr. for Biological Diversity v. Haaland*, 562 F. Supp. 3d 68, 76 (D. Ariz. 2021). Where "the district court is reviewing a decision of an administrative agency which is itself the finder of fact . . . the function of the district court [on a motion for summary judgment] is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985); *see also Barton v. Off. of Navajo*, 125 F.4th 978, 982 (9th Cir. 2025) (same).

/////

---

[4] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

## ANALYSIS

In its motion for summary judgment, plaintiff argues that FWS's determination that a critical habitat designation was "not prudent" violates the ESA because: (1) it runs counter to the evidence before the agency regarding certain threats to the species; (2) FWS acted outside the scope of its regulation in making its "not prudent" determination by applying a standard in doing so that does not comport with the language of the regulation; and (3) FWS's application of the regulation violated the ESA because defendants failed to consider the recovery of the species and the benefits of designation. (Doc. No. 27.) In their cross motion for summary judgment, defendants argue that: (1) plaintiff waived any challenge to the "not prudent" determination by not raising it during notice and comment rulemaking; (2) the decision not to designate critical habitat because it was not prudent to do so was rational and complied with the ESA and implementing regulations; (3) defendants lawfully applied the "not prudent" regulation; and (4) plaintiff's argument that defendants overlooked certain threats to the species is unfounded. (Doc. No. 29.)

### A. Administrative Waiver

Defendants briefly argue that plaintiff failed to comment on FWS's "not prudent" determination in response to the proposed rule and, accordingly, pursuant to the doctrine of administrative waiver, plaintiff has forfeited the right to contest FWS's "not prudent" determination. (Doc. No. 29-1 at 14.)

"As a general rule, courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 487 (9th Cir. 2023) (cleaned up) (citation omitted).

"To bring a citizen suit for a violation of the ESA, a private citizen must give 'written notice of the alleged violation or violations upon which the suit is based at least sixty days before suit is filed.'" *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1150 (9th Cir. 2024) (citation omitted); *see also Eisenbach v. Village of Nelsonville*, 20-cv-08566-VB, 2021 WL 5054119, at *4 (S.D.N.Y. Nov. 1, 2021) (noting that citizen suits may not be brought prior to

sixty days after written notice of the violation has been given to the Secretary and "[a] failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA") (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998)); *Geertson Farms, Inc. v. Johanns*, 439 F. Supp. 2d 1012, 1014 (N.D. Cal. 2006) ("The plaintiffs exhausted their administrative remedies under the ESA by giving the EPA sixty-days notice of the suit[.]"). "[N]otice of an alleged ESA violation provides federal agencies with an opportunity to 'take responsibility' for enforcing the ESA and to correct any violation short of litigation." *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 603 (9th Cir. 2014) (citation omitted).

However, where the doctrine of administrative waiver is applied in the context of official rulemaking, typically "a party's failure to make an argument before the administrative agency in comments on a proposed rule barred it from raising that argument on judicial review." *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004) (citing *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1249 (9th Cir.2000)); *see also All. for the Wild Rockies*, 68 F.4th at 487–88 ("[A]bsent exceptional circumstances, failure to raise arguments before an agency, such as in comments during a public-comment process, usually waives a litigant's rights to make those arguments in court."); *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 12 (D.D.C. 2013) (finding that administrative waiver applies to ESA actions such that arguments not made during notice and comment are waived), *judgment entered,* 301 F.R.D. 14 (D.D.C. 2014), and *aff'd,* 601 F. App'x 1 (D.C. Cir. 2015).

Nonetheless, "a claimant need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010); *see also Center for Community Action and Environmental Justice v. Federal Aviation Administration,* 61 F.4th 633, 640, n.2 (9th Cir. 2023); *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 38 F.4th 34, 58 (9th Cir. 2022). Further, courts generally "will not invoke the waiver rule if an agency has had an opportunity to consider the issue even if the issue was considered *sua sponte* by the agency or was raised by someone other than the petitioning party." *Protect Our Communities*

*Found. v. LaCounte*, 939 F.3d 1029, 1037 (9th Cir. 2019) (cleaned up) (quoting *Portland General Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007)).

Here, regardless of the approach adopted, plaintiff has not waived the issue of whether the SNRF's habitat should have been designated as critical habitat or, conversely, whether such designation was "not prudent." Defendants do not contest that plaintiff raised its challenge to the "not prudent" determination in its sixty-day notice. Further, on April 27, 2011, well before the proposed or final rulemaking, plaintiff and other organizations, had argued in favor of a critical habitat designation for the SNRF by filing a petition with FWS. (Doc. No. 36-1 at 65–66.) Then, in its proposed rule, FWS addressed the issue of whether a critical habitat designation was prudent. (Doc. No. 35-1 at 150.) Again, in the final rule FWS summarized this finding, stating that it "determined that designation of critical habitat was not prudent because the present or threatened destruction, modification, or curtailment of habitat or range is not a threat to the Sierra Nevada DPS[.]" (*Id.* at 160.) This record makes it clear that this was not a situation where defendant was unaware of the challenge to its "not prudent" determination until the close of rulemaking nor was defendant rendered powerless to consider the issue during that rulemaking process.

Under these circumstances, the court concludes that invocation of the waiver rule here would be inappropriate because the agency clearly was put on notice of the challenge and had an opportunity to consider the issue of whether or not its "not prudent" determination was correct.[5] *Protect Our Communities Found.*, 939 F.3d at 1037.

**B. Whether the "Not Prudent" Determination was Inconsistent with the ESA**

Plaintiff argues that the "not prudent" determination at issue here is unlawful because defendants applied their "not prudent" regulation in a manner inconsistent with the dictates of the

/////

[5] Plaintiff advances sub-arguments not specifically raised in the administrative process. However, because defendants do not argue that any of those more specific arguments have been waived, and none of the parties briefed them, the court need not consider whether plaintiff's more specific arguments were waived. The court notes that administrative waiver is not jurisdictional. *See Waterkeeper All. v. U.S. Env't Prot. Agency*, 140 F.4th 1193, 1212 (9th Cir. 2025) (finding that the court had jurisdiction prior to analyzing administrative waiver).

ESA. (Doc. No. 27-1 at 29–30.) Specifically, plaintiff argues that defendants failed to consider the benefits of designating critical habitat and the recovery of the species. (*Id.* at 30–32.)

1. Benefit to the Species

Plaintiff argues that defendants were required to consider the benefits of designating critical habitat. (Doc. No. 27-1 at 31–32.) Defendants appear to concede that they did not consider the benefits of designation, arguing instead that they were not required to do so pursuant to binding precedent. (Doc. No. 29-1 at 19.) Defendants argue that because they are only *permitted* to designate critical habitat if they first find that doing so is necessary or indispensable to the survival or recovery of the species, not merely beneficial to or capable of promoting survival or recovery of the species, the potential benefits of designating critical habitat must be irrelevant to their rulemaking. (*Id.*)

It is true that the Supreme Court has noted that the ESA "identifies" as critical habitat "only certain areas that are indispensable to the conservation of the endangered species." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 20 (2018). In the wake of the decision in *Weyerhaeuser* the Ninth Circuit has held that "[w]hile 'conservation' encompasses both ensuring species' survival and recovery, the ESA nonetheless requires the agency to show that *designation of critical habitat* is 'necessary' or 'indispensable' in accomplishing these objectives, not merely 'beneficial' to or capable of 'promoting' survival or recovery." *Ctr. for Biological Diversity*, 67 F.4th at 1038.

However, earlier this year the Ninth Circuit clarified the import of these broad statements. *Alaska v. Nat'l Marine Fisheries Serv.*, 171 F.4th 1145 (9th Cir. 2026). In *Alaska*, the Ninth Circuit was called upon to interpret the following statutory definition of the phrase "critical habitat."

> **(5)(A)** The term "critical habitat" for a threatened or endangered species means--
>
> **(i)** the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> **(ii)** specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). Alaska had argued that in order to designate critical habitat occupied by the species, the agency was required to find that the *entire area* was indispensable to the survival and recovery of the species. *Alaska*, 171 F.4th at 1157. Instead, the Ninth Circuit found that, given the text of the ESA, an area occupied by the endangered species qualifies as critical habitat when the "area contains biological features 'essential to . . . conservation[,]' [which] is entirely consistent with the area being 'indispensable.'" *Id.* at 1158. For purposes of areas occupied by the species, the court held that "[t]he adjective 'essential' modifies 'physical or biological features' that the 'specific areas' *contain*; it does not modify the 'specific areas' themselves." *Id.*

Further, the Ninth Circuit explained that "[i]n contrast to the standard for *occupied* critical habitat . . . , the neighboring standard for *unoccupied* critical habitat expressly requires a determination that designated areas are themselves 'essential for the conservation of the species.'" *Id.* "The occupied-habitat standard is less onerous because [the agency designating critical habitat] need only show the 'presence of pertinent biological features.'" *Id.* As such, a mere benefit to the species could justify designating occupied lands as critical habitat so long as the beneficial area contains "those physical or biological features . . . essential to the conservation of the species[.]" *Id.* at 1157 (quoting 16 U.S.C. § 1532(5)(A)(i)).

In deciding if 16 U.S.C. § 1533(b)(2) requires FWS to determine whether designation would benefit a listed species before reaching the "not prudent" inquiry, the court finds the analysis conducted by the district court in *Center for Biological Diversity v. United States Fish & Wildlife Service*, 792 F. Supp. 3d 50, 63, 65 (D.D.C. 2025), *appeal dismissed sub nom. Center for Biological Diversity v. United States Fish & Wildlife Service*, No. 25-5325, 2025 WL 3481481 (D.C. Cir. Dec. 3, 2025), to be entirely persuasive. There, the district court addressed whether FWS could find that designating critical habitat was "not prudent" based on the drawback of so designating without considering the countervailing benefits and explained as follows:

/////

Plaintiffs first maintain that the FWS's "not prudent" determination was based on a misreading of the ESA. On Plaintiffs' reading of the statute, the FWS must make certain findings under § 1533(b)(2) before it can invoke the "not prudent" exception under § 1533(a)(3). Plaintiffs interpret subsection (b)(2) as requiring the FWS to weigh the pros and cons of designating critical habitat: FWS must first "determine[ ]" whether designation would benefit a listed species. 16 U.S.C. § 1533(b)(2). If so, it must then weigh those benefits against the benefits of *not* designating critical habitat, taking biological and non-biological factors into consideration. If (and only if) the benefits of not designating outweigh the benefits of designating, "may" the FWS decline to designate critical habitat. *Id.*

The FWS disagrees, asserting that the pros-and-cons analysis set forth in subsection (b)(2) is "inapplicable" to its "not prudent" determination under subsection (a)(3). According to the FWS, subsection (b)(2) "only applies when the Service <u>first</u> determines that designating critical habitat is prudent [under subsection (a)(3)] and <u>then</u> exercises its discretion to exclude specific areas from that critical habitat designation." *Id.* (emphasis in original). As support for this interpretation, the FWS observes that subsection (b)(2) permits the FWS to "exclude any area" from critical habitat after weighing the pros and cons of doing so. The FWS reasons that, because it "did not designate critical habitat *at all*" for the eastern black rail (as opposed to excluding only "specific areas"), the balancing requirement in subsection (b)(2) "do[es] not apply." (emphasis added). With subsection (b)(2) out of the way, the FWS then interprets its implementing regulations as providing the agency with authority to decline to designate any critical habitat so long as it finds that designation would increase a threat (here, the threat posed by birders) to the species. In the FWS's view, then, "[n]either the statute nor the implementing regulations require the Service to weigh the benefits of designating critical habitat"; the agency may decline to designate critical habitat as "not prudent" without making any finding whatsoever regarding whether doing so would, on balance, help or hurt the species.

The FWS's position is at odds with both the text and structure of the ESA. To start, the FWS's reading of the statute disregards the statutory text that expressly ties the subsection (a)(3) designation determination to the subsection (b)(2) balancing requirement. In a show of legislative emphasis, the text cross-references subsection (b)(2) in subsection (a)(3)(A)—requiring the FWS to make the critical habitat designation "in accordance with subsection (b)"—and, then, cross-references subsection (a)(3) in subsection (b)(2)—requiring the FWS to "designate critical habitat, and [to] make revisions thereto, under subsection (a)(3) on the basis of the" criteria specified in subsection (b)(2). *See* 16 U.S.C. § 1533(a)(3), (b)(2). If that were not enough, the FWS's theory—that the balancing required under subsection (b)(2) applies before it can exclude "any" critical habitat but does not apply where it decides to exclude "all" critical habitat—is also unmoored from the plain meaning of the word "any." If a child needs to eat her vegetables before taking "any" cookies, surely, she also needs to do so before taking "all" the cookies. Likewise, because subsection (b)(2) requires the FWS to weigh the

relevant benefits (including the benefits of designation) before excluding "*any* area from critical habitat," 16 U.S.C. § 1533(b)(2) (emphasis added), it also requires the FWS to weigh those same benefits before excluding *all* areas from critical habitat.

Nor does the FWS's reading of the statute give meaning to the requirement that the Secretary designate critical habitat to "the maximum extent prudent." *Id.* § 1533(a)(3)(A). The word "prudent" connotes "sound judgment," "cautio[n]," and far-sighted[-ness]." *Prudent*, Oxford English Dictionary 1382 (2007). Read in context, this means that the FWS "shall" designate critical habitat to the "maximum extent" that it can do so, consistent with sound judgment, caution, and foresight. It is difficult to fathom how the agency could possibly act in that considered manner, or how it could possibly satisfy the "maximum extent" requirement, without considering the net benefits of making a designation. Yet, on the agency's telling, the Secretary can—and should—decline to make a critical habitat designation if doing so carries with it *any* downside, even if the upside of making the designation outweighs the downside by a factor or two, ten, or hundred. Or, to put it more concretely, under the FWS's reading of the statute, the Secretary should decline to designate a critical habitat if doing so will likely result in the loss of a single bird due to overzealous birders, even if the designation will also likely save a hundred birds by protecting essential habitat. Although one might reasonably question whether Congress could possibly have intended such a bizarre result, a far a simpler answer is available: the ESA "means what it says," *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021), and the statute says that the FWS "shall" designate critical habitat "to the maximum extent prudent" and may exclude "any"—or "all"—"area from critical habitat [only] if [it] determines that the benefits of such exclusion outweigh the benefits of" making the designation, *see Nat. Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1125 (9th Cir. 1997) (holding that subsection (b)(2) requires the FWS to "balance the pros and cons of designation" before making "not prudent" determinations under subsection (a)(3)).

Finally, not only is the FWS's argument at odds with the text and common sense, but it also violates the cardinal rule that Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001). In subsection (b)(2), Congress precisely delineated "the basis" upon which the FWS must designate (or may decline to designate) critical habitat. A designation "shall" be based on "the best scientific data available," and the FWS must consider economic, national security, and other relevant impacts. 16 U.S.C. § 1533(b)(2). Subsection (b)(2) then starts with the presumption that the FWS will designate critical habitat; it "may" decline to do so if, and only if, it "determines that the benefits of such exclusion outweigh the benefits of [designation]." *Id.* In other words, designation is the rule, and the FWS may forgo a designation, in whole or in part, only after making these findings. *See Bennett v. Spear*, 520 U.S. 154, 172 (1997) (holding that subsection (b)(2) sets forth "required procedures of decisionmaking" with respect to critical habitat designations). Yet the interpretation the FWS presses here—"<u>first</u>" deciding whether

> designation is "prudent" under subsection (a)(3) and, if so, "then" weighing the benefits under subsection (b)(2), (emphasis in original)—would upend this scheme. The FWS could "first" decide—unconstrained by any meaningful statutory standard—to exclude all critical habitat, thereby avoiding the pros-and-cons analysis required by subsection (b)(2). The FWS offers no reason to infer that, by including the word "prudent" in subsection (a)(3), Congress "alter[ed] the fundamental details" of this analysis and gave the FWS sweeping discretion to decline to designate critical habitat, even when the designation would help preserve or restore the threatened or endangered species. *Whitman*, 531 U.S. at 468.
>
> The Court, accordingly, concludes that the ESA requires the FWS to identify the benefits of designation to the species before deciding to exclude any or all areas of the species' critical habitat.

*Id.* at 63–65 (citations to the record omitted).

In short, under this persuasive analysis conducted by the district court in *Center for Biological Diversity v. United States Fish & Wildlife Service*, if designation would benefit the species, FWS "must then weigh those benefits against the benefits of not designating critical habitat[.]" *Id.* "If (and only if) the benefits of not designating outweigh the benefits of designating, 'may' the FWS decline to designate critical habitat." *Id.* Because defendants were required to consider the benefits to the species of designating critical habitat pursuant to the ESA[6] and failed to do so here, the court finds that defendants' decision not to designate critical habitat was not in accordance with law and therefore cannot stand.

2. Recovery of the Species

Plaintiff further contends (Doc. No. 27-1 at 30–31) that defendants were required to consider recovery of the species in determining whether to designate critical habitat because "'conservation' encompasses both ensuring species' survival and recovery[.]" *Ctr. for Biological Diversity*, 67 F.4th at 1038. Defendants argue that they were not required to consider how designating critical habitat could *assist* the recovery of the species because the purpose of establishing critical habitat is for the government to carve out only territory that is necessary for the species' survival and *essential* for its recovery. (Doc. No. 29-1 at 18–19.)

---

[6] "Because the FWS's statutory violation is sufficient to require vacatur and remand, the Court need not resolve the meaning of the [not a threat] regulation or whether it is valid as written." *Ctr. for Biological Diversity*, 792 F. Supp. 3d at 65 n.2.

The court agrees that the ESA's definition of conservation encompasses ensuring not only species' survival but also their recovery, 16 U.S.C. § 1532(3), and "species not presently threatened by habitat loss may be harmed by the failure to designate habitat because of a diminished capacity for population recovery[,]" *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 24-cv-04651-JST, 2026 WL 898264, at *23 (N.D. Cal. Mar. 30, 2026). Because the court has already determined that "the ESA requires the FWS to identify the benefits of designation to the species before deciding to exclude any or all areas of the species' critical habitat[,]" and one potential benefit of designating critical habitat is that it might assist with the recovery of the species, the court finds that defendants are required to consider recovery of the species in this regard. *Ctr. for Biological Diversity*, 792 F. Supp. 3d at 65 ("[T]he ['not a threat'] regulation is not inconsistent with this theory.").

**C. "Significant" Threat**

Plaintiff also argues that defendants' decision not to designate any part of the Sierra Nevada red fox's habitat as critical habitat was based on an unlawful application of the pertinent regulation. The applicable regulation allows for a determination that critical habitat designation would not be prudent where "[t]he present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species[.]" 50 C.F.R. § 424.12(a)(1)(ii). In the proposed rule, toward the beginning of the "Critical Habitat" section and immediately after reciting the applicable regulation, FWS concluded, in an apparent acknowledgement of the requirements imposed by the regulation, that "the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the Sierra Nevada red fox." (Doc. No. 35-1 at 150.) However, in the final sentence of the proposed rule's discussion of "Critical Habitat[,]" FWS stated instead: "Because we assessed that the present or threatened destruction, modification, or curtailment of the Sierra Nevada red fox's habitat is not a *significant* threat to the species, we have determined that designating critical habitat is not prudent at this time." (*Id.*) (emphasis added).

/////

/////

The court concludes that the addition of the word "significant" impermissibly departs from the meaning of the regulation. The Ninth Circuit has addressed a similar issue in the context of a prior iteration of this regulation, explaining as follows:

> By rewriting its "beneficial to the species" test for prudence into a "beneficial to *most of* the species" requirement, the Service expands the narrow statutory exception for imprudent designations into a broad exemption for imperfect designations. This expansive construction of the "no benefit" prong to the imprudence exception is inconsistent with clear congressional intent [that] in most situations [FWS] will designate critical habitat at the same time that a species is listed as either endangered or threatened[] [and that] [i]t is only in rare circumstances where the specification of critical habitat concurrently with the listing would not be beneficial to the species.

*Nat. Res. Def. Council*, 113 F.3d at 1126 (cleaned up) (citation omitted). Similarly, here FWS's addition of the word "significant" in describing the degree of threat to the species impermissibly expands the regulation that governs the "not prudent" determination despite clear congressional intent that in most situations, FWS ought to designate critical habitat at the same time that a species is listed as either endangered or threatened. Further, it is this unauthorized "significant" standard that appears to pervade the agency's analysis as set out in its proposed and final rule. (Doc. No. 35-1 at 150) ("Overall, we conclude that there are not any current or future *significant* habitat-based threats, and the best available information suggests that threats to the subspecies directly . . . are of *greatest* concern. . . . [Predicted] changes are not currently expected, nor in the future projected, to result in *significant* negative influences on the viability of the DPS.") (emphasis added); (Doc. No. 35-1 at 157) ("Our evaluation of the best available scientific and commercial information indicates the Sierra Nevada DPS's resiliency is not *significantly* adversely affected by impacts specifically associated with its habitat. . . . As such, we conclude that there are not any current or future *significant* habitat-based threats. The best available scientific and commercial information suggests that threats to the subspecies directly (as opposed to habitat) are of *greatest* concern.") (emphasis added).

Even assuming the standard employed by the FWS here is merely inconsistent with the governing regulation, "[t]he seeming inconsistency . . . is, absent explanation, 'the hallmark of arbitrary action.'" *Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1145 (9th Cir.

2015); *see also Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 51 (9th Cir. 2022); *Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*, 606 F. Supp. 2d 1122, 1168 (E.D. Cal. 2008) ("When an agency's factual findings and analyses are contradictory, or when such findings and analyses contradict the [agency's] conclusion, the agency's path cannot reasonably be discerned."). Defendants provide no such explanation, instead arguing that the phrase "habitat-based stressors" is distinct from the phrase "destruction, modification, or curtailment of [its] habitat or range," and only the latter is relevant for purposes of the regulation. (Doc. No. 29-1 at 17.) The court is not persuaded by such fine distinctions where FWS also concludes in its proposed rule that "[b]ecause we assessed that the present or threatened *destruction, modification, or curtailment of the Sierra Nevada red fox's habitat* is not a significant threat to the species, we have determined that designating critical habitat is not prudent at this time." (Doc. No. 35-1 at 150) (emphasis added). Moreover, defendants did not disavow this statement in its final rule, listing only unrelated changes it made in response to comments, and merely summarizing what FWS already "determined . . . [i]n the proposed rule" as to critical habitat designation. (*Id.* at 152, 160.)

Because FWS's intermittent use of correct and incorrect standards in its final rule is both arbitrary and capricious and contrary to law, the court must find in plaintiff's favor on this basis as well. *See Nat. Res. Def. Council*, 38 F.4th at 51 (vacating an interim decision of the EPA as arbitrary and unable to survive substantial evidence review and remanding to the agency for further consideration); *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2004) (noting that the court "will reverse the agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law"); *see also Nat. Grocers v. Rollins*, 157 F.4th 1143, 1164 (9th Cir. 2025) ("[T]he [agency] committed *legal error* by exempting from the definition of 'bioengineered food' any food in which 'genetic material is not detectable pursuant to § 66.9[.]'") (emphasis added).

In sum, the court concludes that defendants have erred in three ways, any one of which would entitle plaintiff to summary judgment—failing to weigh the benefits of designating critical habitat, failing to consider the potential effect on the recovery of the species, and in applying an

incorrect "significant threat" standard. Accordingly, plaintiff's motion for summary judgment in its favor will be granted and defendants' cross-motion denied.[7]

## CONCLUSION

For all of the reasons explained above:

1. Plaintiff's motion for summary judgment (Doc. No. 27) is GRANTED;
2. Defendants' cross-motion for summary judgment (Doc. No. 29) is DENIED; and
3. The parties are directed to meet and confer and, if possible, submit a joint proposed briefing schedule as to the appropriate remedy to be imposed no later than fourteen (14) days from the date of entry of this order.[8]

IT IS SO ORDERED.

Dated: **September 15, 2026**

Dale A. Drozd

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

---

[7] Because the court has already determined that FWS applied an incorrect standard in three regards—failure to consider benefit to the species, failure to consider the effect on the recovery of the species, and intermittent use of the modifier "significant" when analyzing threat to the species—the court will not address plaintiff's additional arguments regarding whether the evidence runs counter to the agency's ultimate decision unless and until the agency has had an opportunity to apply the appropriate standard to the evidence before it. (Doc. No. 27-1 at 21–28.)

[8] The court notes that plaintiff has requested vacatur of FWS's decision not to designate and remand to FWS for proceedings consistent with the court's opinion, with a date-certain deadline for the agency to complete its action. (Doc. No. 27-1 at 32.) However, plaintiff does not provide any reasoned analysis regarding why this is the appropriate remedy here. In addition, defendants do not address the question of the appropriate remedy except to request an opportunity to brief it separately depending upon the court's resolution of the parties' motions for summary judgment. (Doc. No. 29-1 at 29.) The court finds that further briefing addressing this issue will assist the court.